[No. B171775. Second Dist., Div. Four. May 26, 2005.]

MARTY INGELS, Plaintiff and Appellant, v.
WESTWOOD ONE BROADCASTING SERVICES, INC., et al.,
Defendants and Respondents.

**COUNSEL**

Law Office of Robert G. Klein and Robert G. Klein for Plaintiff and Appellant.

Berman, Mausner & Resser and Bernard M. Resser for Defendants and Respondents.

OPINION

HASTINGS, J.—Appellant Marty Ingels sought to participate in a call-in radio talk show. Upon learning appellant's age, the screener told appellant he was too old for the audience to which the show was aimed. Appellant objected that his age should not preclude him from participating in the forum. He was then allowed on the air, where he elected to address his displeasure over his perception that he was a victim of age discrimination, rather than the subject then under discussion on the show. He sued the producers and the talk show host for age discrimination under the Unruh Civil Rights Act, Civil Code section 51 et seq. (hereafter sometimes the Act), and for unfair business competition under Business and Professions Code section 17200 et seq. The trial court granted a special motion to strike pursuant to Code of Civil Procedure section 425.16 and dismissed the action.[1]

We first conclude that the action falls within application of section 425.16 and is not exempt from such treatment under section 425.17. We then conclude, given the unique circumstances presented, appellant has failed to demonstrate a probability he will prevail on his Unruh Civil Rights Act claim. Because his claim for unfair competition is based on a violation of the Act, we also conclude he has failed to demonstrate a probability of prevailing on that claim. We affirm.

## STATEMENT OF FACTS[2]

Respondent Westwood One Broadcasting Services, Inc. produces a radio show hosted by respondent Tom Leykis. The show utilizes the format of a host addressing various topics who responds to listener e-mails and correspondence, and who also takes calls from listeners. The show is described as "an extremely popular singles-oriented radio talk show that is broadcast in Los Angeles each weekday from 3:00 p.m. to 7:00 p.m., as well as by satellite feed to affiliate stations." It is broadcast to affiliated stations in more than 20 states and has an estimated weekly national audience of more than 600,000 adult listeners. We are told: "[I]n the Los Angeles Metro Survey Area, the Tom Leykis Show had a 7.8% share of the Men Aged 25-34 radio audience, making it the second-ranked for all radio stations in the Los Angeles market during its time period."

Topics on the show cover various issues, some of which are listed: "New developments in CD copy protection; Views from outside California on the

---

[1] All further statutory references will be to the Code of Civil Procedure unless otherwise indicated.

[2] The undisputed facts are supported by evidence presented in the special motion to strike brought by respondents and not objected to by appellant. Quotations in the statement of facts are taken from declarations filed in support of the motion.

gubernatorial race results; The national 'Do Not Call' list; Weight discrimination in the workplace; and Handicap and childproofing laws." A common theme is relationships and dating between men and women. Several hundred calls are received during an average broadcast and the calls must be screened and then narrowed down by the host "to a limited number that they believe are on-topic and most interesting to the host and the audience."

Appellant describes himself as a television personality and a concerned citizen. He also hosted his own radio talk show in Los Angeles for two years: "The World As Seen By Marty Ingels." Appellant regularly calls into radio talk shows using the name "Paul Russo." Every show he calls has screeners, and on many occasions he has not been allowed on the air.

On June 25, 2003, appellant was listening to the Tom Leykis show. The topic involved relationships between men and women, a topic which appellant believed was significant. The host was discussing a young man's strategy for, in appellant's words, "luring dates, girls, and being popular, and stuff like that." The host was giving advice to the young man. Appellant decided to call into the show and confront the host to, in appellant's words, "challenge him on his beliefs and win a moral argument . . . ." When he finally got through, he spoke with a screener and told the screener that his name was Paul Russo and that his age was "60," although appellant was actually 65 years of age at the time. The screener made a few jokes about appellant's age and told appellant he didn't belong on the show. Appellant was on and off hold for approximately 11 to 12 minutes, during which time he decided to address the issue of age when he got on the air.

Appellant was then put on the air with Tom Leykis and the following exchange occurred, after which appellant was cut off:

"THE ANNOUNCER: This is the Tom Leykis Show.

"TOM LEYKIS: From Los Angeles, 1-800-580-0TOM.

"Are men shallow? Should we be looking for inner beauty? Ha, ha.

"Paul, on the Tom Leykis show.

"THE CALLER [appellant]: Hey, Larry, are you there?

"TOM LEYKIS: Larry? You're calling for Larry?

"THE CALLER: Yeah.

"TOM LEYKIS: All right. Hold on a second, will you?

"(Pause.)

"THE ANNOUNCER: This is the Tom Leykis Show.

"TOM LEYKIS: Yes. 1-800-580-0TOM.

"This is Paul on the Tom Leykis Show. Hello.

"THE CALLER [again appellant]: Tom?

"TOM LEYKIS: Oh, I thought you were calling for Larry.

"THE CALLER: No. I made a mistake. I have been waiting three years. I am surprised I know my own name, okay.

"TOM LEYKIS: I am surprised, too.

"THE CALLER: Are you there?

"TOM LEYKIS: No. I left the room.

"THE CALLER: Hey, Tom, I hope you got an answer for me. I had to actually muscle my way in here, because I am older than your demographic.

"TOM LEYKIS: You're not just older than my demographic, you're the grandfather of my demographic.

"THE CALLER: What's that got to do with what's in my brain and what I have to say?

"TOM LEYKIS: Because we're not aiming at people your age, Pops.

"THE CALLER: What does that mean, 'aiming at'? I—

"TOM LEYKIS: Very simple: it's called targeted demographics, Pal.

"THE CALLER: Okay. That's all business. Now, I got a valid job (unintelligible)—

"TOM LEYKIS: I don't really care if you have a valid point. You know what, the bottom line is, our audience is young men.

"THE CALLER: Why is that?

"TOM LEYKIS: Because every radio station has a particular targeted audience.

"THE CALLER: That's got to do with commercial stuff, though—

"TOM LEYKIS: Right. And that's what we do: We sell advertising here, in case you didn't notice.

"That's the business I'm in. I'm not in the business of trying to appeal to people like you calling from a rest home or a card room.

"THE CALLER: Isn't that sad?

"TOM LEYKIS: You know what, no, it isn't.

"THE CALLER: It isn't? What about—

"TOM LEYKIS: You know what, when they play big band music on the radio, they don't play any Tool. Why not?

"THE CALLER: Tom, listen. I am—

"TOM LEYKIS: Why don't they have any 12 year olds calling in?

"THE CALLER: I am smart enough about—

"TOM LEYKIS: I don't really care how smart you are, Pal. You know what, we have a targeted demographic on this program; you don't fit it, period. You're way too old, Pops. You don't belong on the air. Call a big band station. Call somebody else, please. Don't call here.

"It's called targeted demographics. 'Oh, it's all about advertising, isn't it?' Yes. Yes it is. Do you hear how many commercials are on this show? We sell lots of advertising, because we have got a targeted demographic that people want to buy, and it doesn't include people who don't go out and ride motorcycles and drive expensive cars and drink beer. Ha, ha, ha."

Appellant's suit names as defendants Westwood One Broadcasting Services, Inc. and Tom Leykis. The first cause of action alleges a violation of the Act with the following pertinent charging allegations: "10. During the June 25, 2003 telephone call, Leykis intentionally deprived Ingels of the advantages, privileges, and accommodations of The Tom Leykis Show by

refusing to allow Ingels to participate in the show based upon Ingels' age (i.e. over 60 years old). [¶] 11. During the June 25, 2003 telephone call, Leykis put Ingels on the air and proceeded to berate and humiliate Ingels and refused to allow Ingels to air his opinions or participate in the show because of Ingels' age. [¶] 12. As a direct and proximate cause of Defendants' conduct, Ingels suffered a loss of dignity, hurt feelings, and emotional upset and distress in an amount to be determined at the time of trial. Ingels also seeks treble that amount as allowed by law. [¶] 13. Ingels has further presumed damages in the amount of $4,000.00 as defined in *Civil Code* § 52."

The second cause of action, brought by appellant "individually and on behalf of the general public . . . ,'" alleges unfair competition, with the following pertinent charging allegations: "20. Commencing at least as early as June 25, 2003, defendants have committed acts of unfair competition, as defined by *Business and Professions Code* section 17200, by engaging in the following unfair and unlawful business practices: [¶] a. using the public airwaves to encourage members of the public to telephone into the radio talk show and then discriminating against certain members of the public based upon age; [¶] b. engaging in an unlawful act and practices in violation of the Unruh Civil Rights Act found at *Civil Code* § 51 et. seq. by depriving members of the public of the advantages, privileges, and accommodations of a business establishment by refusing to allow the general public to participate in the radio talk show based upon the caller's age or other prohibited basis."

In connection with the first cause of action, appellant prayed for recovery of compensatory damages, statutory damages, punitive damages, attorney fees, and for a permanent injunction pursuant to Business & Professions Code section 17203. Appellant sought only injunctive relief and attorney fees in connection with the second cause of action.

Respondents filed a special motion to strike pursuant to section 425.16, supported by various declarations. They argued that appellant would be unable to prevail in his claims: "Ingels cannot meet his burden to prove that [respondents] committed any actual violation of the Unruh Civil Rights Act. Ingels is manifestly not a 'person denied the rights provided in Section 51,' because Ingels admits that he was in fact put on the air with Leykis, (Complaint, ¶ 11), and because age is not and should not be a protected class in this context. Without any Unruh Act claim, Ingels' Unfair Competition claim cannot stand. [¶] Ingels' claims fail as a matter of law under the First Amendment, the Supremacy Clause, and Preemption Doctrine because the Unruh Act does not trump the First Amendment and broadcast freedom."

Appellant opposed the motion, first contending that his claims fell outside the scope of section 425.16. He argued that because the action was for age discrimination it did not address any First Amendment rights of respondents. His fallback argument was that he had demonstrated a valid age discrimination claim under the Act and he would be able to prevail on his claims. He did not challenge the evidentiary foundation supporting respondents' motion.

The trial court found the action fell within the scope of section 425.16 and that appellant had failed to demonstrate a probability of prevailing on his claims. On the issue of the merits of appellant's claims the court's minute order provides:

"Plaintiff argues that there is no legitimate viewpoint neutral reason for barring the views of a person older than 60 from the show. But Plaintiff must provide evidence to support his allegations that discrimination occurred and there was no viewpoint neutral reason behind excluding him. It is enough if the Plaintiff establishes a substantial or reasonable probability of success . . . . Plaintiff provides little if any evidence in his sole Exhibit A that he was actually initially barred from the show ¶ 10, that this was based on his age as alleged in ¶ 10 or that the radio show has any policy which excludes older people (Opp. at 2 and 5). This lack of evidence does not overcome the First Amendment protections against prior restraints upon broadcasters as discussed above. As Defendant argues, to the contrary, Plaintiff admits that during his call, (1) he spoke for several minutes with the call screener . . . ; (2) he was put on the air with the show host . . . ; (3) he engaged the host in a discussion of whether the host should be entitled to screen out a caller based on his stated age, hoping the host would respond, which he did. . . . Plaintiff has not made a prima facie showing that he was treated any differently than any other caller, such that he was denied equal accommodations under the Unruh Act. Therefore, this act cannot be applied to impose upon broadcasters a viewpoint unwanted in their message to targeted audiences. [¶] . . . [¶]

"A defendant cannot be liable under § 17200 for committing 'unlawful business practices' without having violated another law. Here no violation of the Unruh Act is capable of proof given the facts placed before this court. *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 938–39 [134 Cal.Rptr.2d 101]. If the Unruh Act claim is dismissed, then there is no 'unlawful' act upon which to base[] the derivative Unfair Competition claim."

An order granting the special motion to strike and dismissing the action was entered and a timely notice of appeal was filed.

## DISCUSSION

### 1. *Special Motions to Strike, Generally*

In 1992, the Legislature enacted Code of Civil Procedure section 425.16 in response to its perception "that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a); see *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 817 [33 Cal.Rptr.2d 446], overruled in part on other grounds by *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 [124 Cal.Rptr.2d 507, 52 P.3d 685] *(Equilon).*)

■ Section 425.16 provides a procedural remedy to a party who perceives that an action qualifies as a strategic lawsuit against public participation (SLAPP). That party may bring what is termed a *special motion to strike* against a claim "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) The term "person" includes a corporation. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 862–863 [44 Cal.Rptr.2d 46], superseded by statute on other grounds as stated in *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 477 [102 Cal.Rptr.2d 205].)

■ The moving party has the initial burden of establishing that the claims challenged "arise from acts of the [moving party] taken to further the [moving party's] right of free speech or petition in connection with a public issue." (*Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1365 [102 Cal.Rptr.2d 864], overruled in part on other grounds by *Equilon, supra,* 29 Cal.4th at p. 68, fn. 5.) If the moving party fails to carry its initial burden, the motion must be denied. (*Ibid.*)

■ If the moving party brings the action within section 425.16, the burden shifts to the opposing party to demonstrate the "probability that the [opposing party] will prevail on the claim." (§ 425.16, subd. (b)(1).) If the trial court concludes that the opposing party demonstrates a "probability of success"—i.e., there is sufficient evidence before the court to support a prima facie case—the special motion to strike must be denied. (*M.G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623, 636–637 [107 Cal.Rptr.2d 504].) But if the opposing party fails to make the requisite showing, the motion must be

granted. (*Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1450 [83 Cal.Rptr.2d 443]; *Dixon v. Superior Court* (1994) 30 Cal.App.4th 733, 745–746 [36 Cal.Rptr.2d 687].)

On appeal, "[w]e apply the de novo standard of review to both prongs of the anti-SLAPP statute. [Citation.]" (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103 [15 Cal.Rptr.3d 215].)

## 2. *Does the Action Fall Within Section 425.16?*

In reviewing whether a defendant has met its initial burden of proving that an action falls within section 425.16, "we consider the pleadings and any supporting and opposing affidavits stating facts upon which the liability is based. [Citations.] '[T]he statutory phrase "cause of action . . . arising from" means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. . . .' [Citation.] '[T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech.' [Citation.] The moving defendant has no obligation to demonstrate that the plaintiff's subjective intent was to chill the exercise of constitutional speech or partition rights, or that the action had the effect of chilling such rights. [Citation.] The 'principal thrust or gravaman' of the claim determines whether section 425.16 applies. [Citation.]" (*Mann v. Quality Old Time Service, Inc., supra,* 120 Cal.App.4th at pp. 102–103, first italics in original, second italics added.)

Subdivision (e) of section 425.16 includes four categories describing what qualifies for treatment under the section. Items (3) and (4) appear to be the ones at issue here. "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: . . . (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Ibid.*)

A case treated under section 425.16 and presenting facts similar to those at issue here is *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798 [119 Cal.Rptr.2d 108] (*Seelig*). The plaintiff in *Seelig* was a participant in a previously taped television program titled *Who Wants to Marry a Millionaire,* which was to air during the evening of February 15, 2000. In early February,

a representative from a morning radio call-in talk show styled "Sarah and Vinnie" contacted the plaintiff, a resident in the locale of the talk show, and asked if she would appear on the talk show to discuss the upcoming television program. She declined saying that she did not want to bring attention to herself or to subject herself to "public humiliation." (*Id.* at p. 802.)

On the morning of February 15, 2000, the principals of the talk show discussed the upcoming *Who Wants to Marry a Millionaire* and told the listeners that they had contacted a local resident, without naming her, and had requested that she be on the show. The hosts then exchanged various comments ridiculing her refusal to appear on the show and making arguably disparaging remarks about her. Despite the fact plaintiff had not been identified by name, listeners were able to identify her and she received phone calls from friends and business associates who commiserated with her about the broadcast. She sued Infinity Broadcasting and three of its employees alleging claims for slander, invasion of privacy and intentional infliction of emotional distress, along with others. The defendants successfully moved to strike the complaint pursuant to section 425.16. The matter was appealed and the first issue addressed was plaintiff's argument that the activity did not qualify for treatment under section 425.16. This argument was rejected:

"Plaintiff argues that the offending comments by defendants were not directed at her *participation* in the television contest, but instead were directed at her *refusal to participate* in the radio program. The distinction is unpersuasive. To satisfy the first threshold requirement, the offending comments must have been made 'in connection with an issue of public interest.' (§ 425.16, subd. (e)(3).) Furthermore, this requirement, like all of section 425.16, is to be 'construed broadly' so as to encourage participation by all segments of our society in vigorous public debate related to issues of public interest. [Citations.]

"The topic under discussion on the radio program was plaintiff's appearance on the [television] Show, and 'why she wants to marry some random guy.' Indeed, it is evident that defendants talked about plaintiff only because she had participated in the Show. Disparaging her refusal to appear on the radio program . . . was indistinguishable from criticizing her participation in the televised contest. It was, in effect, the radio variant of the 'empty chair' scenario, which is occasionally played out live or on television: a participant in an issue of public controversy declines to appear at a forum to discuss the matter and the host sets a place at the table, an empty chair, to emphasize that the absence underlines the flaw in the party's position. Thus, criticism of the

refusal to defend her participation in the contest satisfies the requirement of being 'in connection with an issue of public interest.' (§ 425.16, subd. (e)(3).)" (*Seelig, supra,* 97 Cal.App.4th at p. 808, fn. omitted.)

We see no distinction between *Seelig* and the facts of this case for purposes of section 425.16. Here, appellant casts the issue as the purported refusal of respondents to allow him to participate in the call-in show because of his age. In *Seelig,* as here, the alleged tortious conduct occurred in connection with a live call-in radio talk show addressing subjects of interest to the public at large. Of equal import is the fact that both situations the subject addressed was participation in the talk show. The court in *Seelig* concluded that criticism of plaintiff's refusal to participate in the talk show was a matter of public interest. Here, respondents did allow appellant on the air and appellant addressed the reluctance of respondents to allow him to participate in the discussion at issue because of his age.

█ Appellant attempts to distinguish *Seelig* and other similar cases as involving claims of defamation and invasion of privacy—claims, he argues, which are appropriate for treatment under section 425.16. He contends there is no nexus between his claim for age discrimination and a chilling of respondents' First Amendment rights. We disagree with this proposition. The nature of the cause of action alleged is not dispositive. "SLAPP suits can conceivably be pleaded in terms of breach of contract or other valid actions. [Citation.] When considering a section 425.16 motion, a court must consider the actual objective of the suit and grant the motion if the true goal is to interfere with *and burden* the defendant's exercise of his free speech and petition rights. [Citations.]" (*Foothills Townhome Assn. v. Christiansen* (1998) 65 Cal.App.4th 688, 696 [76 Cal.Rptr.2d 516], italics added, overruled in part on other grounds by *Equilon, supra,* 29 Cal.4th at p. 68, fn. 5.)

█ We look to the context out of which appellant's claims arose: his attempt to express himself in an open forum carried over the airwaves of public radio. In this context, appellant and respondents each are imbued with First Amendment rights which may be burdened by resolution of issues to be addressed in this action. The Legislature has declared that section 425.16 "shall be construed broadly." (§ 425.16, subd. (a).) We have no trouble concluding that respondents' activity in providing an open forum by means of a call-in radio talk show fits within the scope of section 425.16, subdivision (e)(4).

### 3. *Does Section 425.17 Preclude Application of Section 425.16?*

Appellant argues that his action does not qualify for treatment under section 425.16 by reason of section 425.17, subdivision (b). Section 425.17

was enacted in 2003 and became effective January 1, 2004, after the trial court ruled on the motion in this case.

Respondents counter with three arguments why section 425.17 should not apply: (1) appellant's action does not meet all three criteria listed under subdivision (b); (2) appellant's claims, arising from a call-in radio talk show, fall within the exemptions listed under section 425.17, subdivision (d); and (3) section 425.17 was not applicable when the matter was argued before the trial court, therefore, the matter must be remanded to the trial court for the parties to better develop the record.

■ "The Legislature enacted section 425.17, effective January 1, 2004, to address a 'disturbing abuse' in litigants' use of the anti-SLAPP statute. (§ 425.17, subd. (a).) The new statute applies to lawsuits brought before its effective date because it constituted a procedural change regulating the conduct of ongoing litigation and thus triggered no retroactivity concerns. [Citation.]" (*Mann v. Quality Old Time Service, Inc., supra,* 120 Cal.App.4th at p. 112.)

Because there are no disputed facts presented, only an application of law, and because respondents have responded on the merits to the section 425.17 argument, we will address the issue. (*Yeap v. Leake* (1997) 60 Cal.App.4th 591, 599 [70 Cal.Rptr.2d 680].)

As pertinent, section 425.17, subdivision (b) provides:

"Section 425.16 does not apply to any action brought solely in the public interest or on behalf of the general public if all of the following conditions exist:

"(1) The plaintiff does not seek any relief greater than or different from the relief sought for the general public or a class of which the plaintiff is a member. A claim for attorney's fees, costs, or penalties does not constitute greater or different relief for purposes of this subdivision.

"(2) The action, if successful, would enforce an important right affecting the public interest, and would confer a significant benefit, whether pecuniary or nonpecuniary, on the general public or a large class of persons.

"(3) Private enforcement is necessary and places a disproportionate financial burden on the plaintiff in relation to the plaintiff's stake in the matter."

There are yet no reported cases construing the scope of section 425.17, subdivision (b). The limited number of reported cases to date involve commercial speech, which is addressed under subdivision (c) of section 425.17. On its face, subdivision (b) appears to exempt class actions and private attorney general suits from treatment under section 425.16. A review of the legislative history confirms that was the intent of the Legislature. "SB 515 would make the SLAPP motion inapplicable to public interest and class action lawsuits 'brought solely in the public interest or on behalf of the general public' when three specified conditions are met. In general, the qualifying language would clearly encompass claims brought under the Unfair Competition Law (Business and Professions Code Section 17200 et. seq.), the Unfair Practices Act (Business and Professions Code Section 17500 et. seq.), the Consumer Legal Remedies Act (Civil Code Section 1750 et. seq.), as well as any other public interest or class actions lawsuits where the three specified conditions are met." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 13; see also Assem. Com. on Judiciary, Rep. On Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, p. 11.)

■■■ The first condition listed is that "[t]he plaintiff does not seek any relief greater than or different from the relief sought for the general public or a class of which the plaintiff is a member." (§ 425.17, subd. (b)(1).) The reason for this condition is explained in the Senate report: " ' "There are certain statutes that protect public health or consumers that allow for enforcement by private attorneys general, *without an injured plaintiff*. Conceptually, these are virtually identical to when the D.A. or Attorney General enforces those same statutes. [Citations.] Since the statute already exempts actions filed by public prosecutors, it should provide a parallel protection when people are acting only in the public interest as private attorneys general, *and are not seeking any special relief for themselves*." ' " The public interest criteria also make clear that suits motivated by personal gain are not exempted from the anti-SLAPP motion. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, pp. 13–14, italics added.)

Appellant's first cause of action is for age discrimination under the Act. In connection with this claim, appellant alleges: "As a direct and proximate cause of [respondents'] conduct, [appellant] suffered a loss of dignity, hurt feelings, and emotional upset and distress in an amount to be determined at the time of trial. [Appellant] also seeks treble that amount as

allowed by law." Because appellant alleges and seeks recovery of damages personal to himself, his claim fails to meet the first requirement set out in section 425.17, subdivision (b).

Appellant's second cause of action is for unlawful business practices pursuant to Business and Professions Code section 17200 and is brought on behalf of appellant "individually and on behalf of the general public . . . ." Appellant seeks injunctive relief, attorney fees and "[a]ny further relief that the court may deem just and equitable." On its face, this claim fell within the exemption of section 425.17, subdivision (b), because appellant was not seeking any special relief for himself. But in response to a letter we sent requesting that the parties address applicability of Proposition 64 to the instant case, appellant responded that it did not apply because he was seeking damages personal to himself.[3] That being clarified, the second cause of action also does not qualify for treatment under section 425.17, subdivision (b).

But even if appellant were seeking relief no different or greater than relief sought for the general public, pursuant to subdivision (d)(2) of section 425.17, the claims are excepted from the section 425.16 exemption.

The action is against the producer of a talk show, Westwood One Broadcasting, and the host of the show, Tom Leykis. Subdivision (d)(2) excepts from application of subdivision (b) "[a]ny action against any person or entity based upon the creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work, including, *but not limited to*, a motion picture or television program, or an article published in a newspaper or magazine of general circulation." (§ 425.17, subd. (d)(2), italics added.)

The Senate analysis includes the following explanation for the exceptions listed in section 425.17, subdivision (d): "Proposed subdivision (d) of newly added Section 425.17 would exempt the news media and other media defendants (such as the motion picture industry) from the bill when the underlying act relates to news gathering and reporting to the public with respect to the news media or to activities involving the creation or dissemination of any works of a motion picture or television studio. For claims arising

---

[3] Approved at the November 2, 2004, election, Proposition 64 amended, among other sections, Business and Professions Code section 17204 to require that a plaintiff bringing an action for unfair business practices must have "suffered injury in fact and has lost money or property as a result of such unfair competition." Whether Proposition 64 is retroactive or not is currently before the California Supreme Court in a number of cases, an issue we need not address given our analysis of the Unruh Civil Rights Act claim.

from these activities, the current SLAPP motion would remain available to these defendants." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 14.)

■ The fact that "radio stations" are not specifically listed is of no moment because the language of the subdivision specifically states it is not inclusive. The Tom Leykis show is designed and produced to elicit viewpoints from members of the public on issues of public interest which are contemporaneously aired to the public at large. We see no distinction in this and the gathering and dissemination of news by other media organizations which are identified in the exception.

We conclude that section 425.17 does not preclude application of section 425.16 to this action. We therefore turn to the issue of whether appellant has provided evidence demonstrating a probability that he will prevail on the claims. (§ 425.16, subd. (b)(1).)

4. *The Probability of Prevailing on the Claims*

As pertinent, Civil Code section 51 states: "(b) All persons within the jurisdiction of this state are free and equal, and no matter what their *sex, race, color, religion, ancestry, national origin, disability, or medical condition* are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in *all business establishments* of every kind whatsoever." (Italics added.)

■ Because the unfair competition claim utilizes the Act as its triggering statute, if no violation of the Act has been demonstrated, the entire action must be stricken. (*Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 937–941 [134 Cal.Rptr.2d 101].)

We first note, as the trial court found, that appellant was not excluded from participating on the program. It was appellant who elected to change the topic he originally called in to discuss and take on the host for threatening to exclude him from the air because of his age. But appellant still purports to be making a claim on behalf of the general public. Thus, we need to discuss the ultimate issues presented by this case.

A. *Does the Act Address Age Discrimination?*

■ Respondents argue that the Act does not apply to a claim for age discrimination because "age" is not included within the types of discrimination delineated in the Act. It is true that "age" is not listed in the statute, but cases have construed the Act to include age discrimination.

In *Flowers v. John Burnham & Co.* (1971) 21 Cal.App.3d 700 [98 Cal.Rptr. 644], the plaintiffs brought an action for age discrimination in housing after their landlord evicted them. A demurrer was sustained by the trial court without leave to amend. Without analysis, the Court of Appeal concluded the Act applied: "Although liability for damages under section 52 has been invoked primarily for racial discrimination '. . . its language and its history compel the conclusion . . . the Legislature intended to prohibit *all* arbitrary discrimination by business establishments. . . .' [Citation.]" (*Id.* at pp. 702–703, italics added.) But the demurrer was upheld when the court concluded that the landlord's rationale for excluding minor male children over five years of age was reasonable, not arbitrary. (*Id.* at p. 703.)

In *Sunrise Country Club Assn. v. Proud* (1987) 190 Cal.App.3d 377 [235 Cal.Rptr. 404], the issue was whether the Act precluded the homeowners association of Sunrise Country Club from limiting the sale and use of certain areas of the condominium development, identified as "Adult" regions, to families with children 16 years of age and older. The homeowners association argued the Act did not apply to age restrictions. Again without analysis, the Court of Appeal concluded that the Act applied but it affirmed the trial court's issuance of a restraining order, finding that the age restriction was reasonable under the circumstances: "The trial court determined and we agree that the division of Sunrise County Club into adult and family regions where over one-half the living units and swimming pools are designed for family use does not constitute an unreasonable or arbitrary age discrimination." (*Id.* at p. 382.)

In *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721 [180 Cal.Rptr. 496, 640 P.2d 115], the Supreme Court addressed a claim of discrimination under the Act brought by a family with a minor child against an apartment complex for refusing to rent to the family. The trial court concluded the specific categories of discrimination listed in the Act were exclusive and because age was not listed the action could not proceed. Citing and quoting from its prior opinion, *In re Cox* (1970) 3 Cal.3d 205 [90 Cal.Rptr. 24, 474 P.2d 992], the Supreme Court disagreed with this limited interpretation of the Act: "After reviewing the common law origin, the legislative history and the past judicial interpretations of the act and its statutory predecessors, our court unanimously concluded in *Cox* that the 'identification of particular bases of discrimination—color, race, religion, ancestry, and national origin—. . . *is illustrative rather than restrictive.* [Citation.] Although the legislation has been invoked primarily by persons alleging discrimination on racial grounds, its language and its history compel

the conclusion that the Legislature intended to prohibit *all arbitrary discrimination by business establishments.'. . . ."* (*Marina Point, Ltd.,* at p. 732.) In the summary holding preceding the discussion of the facts and the law, the opinion states: "Whether the exclusionary policy rests on the alleged undesirable propensities of those of a particular race, nationality, occupation, political affiliation, *or age,* in this context the Unruh Act protects individuals from such arbitrary discrimination." (*Id.* at p. 726, italics added.)

Respondents rely upon more recent language in *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873] for the proposition that the Supreme Court has drawn back from its broader reading of the Act. It is true that in *Harris* the Supreme Court did refuse to extend the Act to include "economic discrimination," but it reaffirmed its prior opinions with regard to age and other nonlisted categories of discrimination: "Although defendants' argument against *Cox, Marina Point,* and related cases is not without foundation, it does not afford a sufficiently compelling reason to overrule the holdings of *Cox* and its progeny." (*Id.* at p. 1155.)

More recently, in reference to the Act, the case of *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, [82 Cal.Rptr.2d 368], states: "The Act prohibits arbitrary discrimination by businesses on the basis of specified classifications such as age. [Citations.]" (*Id.* at p. 1502.)

 Based on the foregoing authority, we have no trouble concluding that arbitrary age discrimination is prohibited by the Act.

### B. *Does the Act Apply to the Call-in Show?*

Respondents suggest that its "Private Radio Program" is not a "public accommodation" within the scope of the Act because California has no compelling state interest in recognizing it as such.

 The Act addresses commercial business activity and has been applied broadly to "common carriers and places of public accommodation and recreation, e.g., railroads, hotels, restaurants, theaters and the like, to include 'all business establishments of every kind whatsoever.' [Citation.]" (*Marina Point, Ltd. v. Wolfson, supra,* 30 Cal.3d at p. 731.) The Act also applies to nonprofit businesses as well as community service organizations. (*O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790, 796 [191 Cal.Rptr. 320]; *Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 81 [219 Cal.Rptr. 150, 707 P.2d 212].)

■ "By its use of the emphatic words 'all' and 'of every kind whatsoever,' the Legislature intended that the phrase 'business establishments' be interpreted 'in the broadest sense reasonably possible.' [Citation.] . . . [¶] . . . [¶] The original version of the bill which became the Unruh Act extended its antidiscriminatory provisions to 'all public or private groups, organizations, associations, business establishments, schools, and public facilities . . . .' (See Assem. Bill No. 594, as introduced Jan. 21, 1959.) Later versions dropped all the specific enumerations except 'business establishments' but added to the latter phrase the modifying words 'of every kind whatsoever.' [¶] 'The broadened scope of business establishments in the final version of the bill, in our view, is indicative of an intent by the Legislature to include therein *all private and public groups and organizations* [specified in the original bill] that may reasonably be found to constitute "business establishments of every type [*sic*] whatsoever." ' [Citation.]" (*Isbister v. Boys' Club of Santa Cruz, Inc.*, *supra*, 40 Cal.3d at pp. 78–79.)

We first note that the Act has been found potentially applicable to some aspects of an entity's operation but not others. In *Curran v. Mount Diablo Council of the Boy Scouts* (1998) 17 Cal.4th 670 [72 Cal.Rptr.2d 410, 952 P.2d 218] (*Curran*), the plaintiff brought a claim of discrimination based on sexual orientation against a local council of the Boy Scouts of America. The evidence established that the council engaged in business transactions with nonmembers on a regular basis. It also established that "the Boy Scouts is an expressive social organization whose primary function is the inculcation of values in its youth members, and whose small social group structures and activities are not comparable to those of a traditional place of public accommodation or amusement." (*Id.* at p. 699.) The court concluded: "Although we have no doubt that the Unruh Civil Rights Act would apply to, and would prohibit discrimination in, the actual business transactions with nonmembers engaged in by the Boy Scouts in its retail stores and elsewhere—indeed, at oral argument, defendant's counsel conceded this point—we conclude that such transactions do not render the Boy Scouts a business establishment so as to bring its membership policies or decisions within the reach of the Unruh Civil Rights Act." (*Id.* at p. 700, fn. omitted.)

In the companion case of *Randall v. Orange County Council* (1998) 17 Cal.4th 736 [72 Cal.Rptr.2d 453, 952 P.2d 261], the Supreme Court addressed an Unruh Civil Rights Act claim of religious discrimination in connection with membership in the Cub Scouts. As in *Curran*, the evidence established the local council was involved in certain commercial business transactions, but that was insufficient to bring it within the Act for a claim based on denial

of membership. "For the reasons set forth in *Curran, supra,* 17 Cal.4th 670, we conclude that defendant's attributes and activities render the Unruh Civil Rights Act inapplicable to its membership decisions. Defendant not only is a charitable organization with a predominantly expressive social purpose unrelated to the promotion of the economic interests of its members, but offers to its members a program that is not the equivalent of a traditional place of public accommodation or amusement. Despite the organization's limited business transactions with the public, defendant does not sell the right to participate in the activities it offers to its members. For these reasons, with regard to its membership decisions, defendant is not operating a business establishment within the purview of California's public accommodation statute." (17 Cal.4th at p. 744.)

 Given that we must construe the Act broadly, we have no doubt that certain aspects of operating and publishing a commercial syndicated talk show may qualify for treatment under the Act: for example, when addressing issues of discrimination in advertising or denial of access to facilities. But production and airing of a talk show involving public discourse of necessity involves a free speech component which calls into play the First Amendment of the United States Constitution. (*Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 636 [129 L.Ed.2d 497, 114 S.Ct. 2445]; *Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241, 258 [41 L.Ed.2d 730, 94 S.Ct. 2831]; *Columbia Broadcasting v. Democratic Comm.* (1973) 412 U.S. 94, 132 [36 L.Ed.2d 772, 93 S.Ct. 2080]; *Seelig, supra,* 97 Cal.App.4th at pp. 807–808.) When First Amendment rights are involved, countervailing interests require additional scrutiny. (*Hart v. Cult Awareness Network* (1993) 13 Cal.App.4th 777, 791–793 [16 Cal.Rptr.2d 705] (*Hart*).) Only if the state has a compelling interest to justify application of the Act, may appellant prevail at the time of trial. (*Ibid.*)

We review *Hart,* which provides guidance on the subject. In *Hart,* the First Amendment right of association was measured against a claim based on the Act. The defendants were the Cult Awareness Network (CAN-National) and the Los Angeles chapter of CAN-National (CAN-LA). CAN-National is described as "a nonprofit corporation; its purpose is to educate the public about the harmful effects of mind control as practiced by destructive cults and about the unethical or illegal practices they employ." (*Hart, supra,* 13 Cal.App.4th at p. 782.) Membership in CAN-National was available to individuals without regard to race, religion, or national origin who paid an annual membership fee of $30. CAN-LA is described as an unincorporated

association separate from, but authorized to exist, by CAN-National. A publication in 1991 by the Better Business Bureau serving Southern California stated that CAN-National maintained extensive information filed on the Church of Scientology.

The plaintiff was a member of the Church of Scientology. The Church of Scientology identified CAN "as a suppressive group, which church literature defines as 'one that actively seeks to suppress or damage Scientology or a Scientologist by Suppressive Acts.' " (*Hart, supra*, 13 Cal.App.4th at p. 783.) The plaintiff sent a letter to CAN-LA identifying himself as a Scientologist and seeking membership in CAN-LA. His request for membership was refused because of his membership in the Church of Scientology.

The plaintiff filed suit alleging damages and seeking injunctive relief for religious discrimination in violation of the Act. The trial court denied a preliminary injunction, concluding that the plaintiff "did not demonstrate a reasonable probability he would succeed in showing that CAN-LA is a business establishment within the meaning of Civil Code section 51 and that plaintiff did not demonstrate that the balance of hardships favored him." (*Hart, supra*, 13 Cal.App.4th at p. 785.)

On appeal, the Court of Appeal described the issue to be addressed as follows: "The issue before us is whether the trial court properly determined that it is not reasonably probable that plaintiff will succeed in demonstrating that CAN-LA is a business establishment within the meaning of Civil Code section 51." (*Hart, supra*, 13 Cal.App.4th at p. 781, fn. omitted.) The Court of Appeal first recognized that CAN-LA enjoyed a right of freedom of association under the First Amendment. It then noted: "Accordingly, CAN-LA possesses the distinctive characteristics which entitle its membership decisions to constitutional protection. Application of the Unruh Civil Rights Act to CAN-LA in this case would thus infringe upon its members' rights of private association." (*Id.* at p. 789.) It then recognized, " 'The right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, *unrelated to the suppression of ideas*, that cannot be achieved through means significantly less restrictive of associational freedoms.' [Citation.]" (*Id.* at p. 791, italics added.) It then addressed whether the state had a sufficient justification to apply the Act under the circumstances presented and concluded in the negative:

"We conclude that appellant has failed to identify any *state* interest, let alone one which is sufficiently countervailing or compelling, as to justify the infringements on the constitutional rights of CAN-LA which could occur were the Unruh Civil Rights Act to apply in this case.

"Pursuant to our duty to construe the term 'business establishments' under the Unruh Civil Rights Act in the broadest sense *reasonably* possible, which includes the duty to avoid constitutional infirmity, we hold that CAN-LA is not a business establishment within the meaning of the act. Thus, the trial court did not abuse its discretion in determining that it was not reasonably probable that Hart would succeed on the merits at trial." (*Hart, supra*, 13 Cal.App.4th at pp. 792–793.)

 Here, we are dealing with access to a public radio show and not with membership in an organization. But we believe the principles are the same. The trial court recognized respondents have a First Amendment right to control the content of their program, subject to strict scrutiny. It wrote: " 'Laws that compel speakers to utter or distribute speech bearing a particular message are subject to . . . rigorous scrutiny.' *Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 642 [129 L.Ed.2d 497, 114 S.Ct. 2445]. 'In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, see *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 [82 L.Ed.2d 221, 104 S.Ct. 3065] (1984), because in most cases they pose a less substantial risk of exercising certain ideas or viewpoints from the public dialogue.' *Id.* Here, the broadcaster's choice of which callers to allow on the air is part of the content of speech. See *Riley v. Nat. Fed. of the Blind of N. Carolina, Inc.* (1988) 487 U.S. 781, 795 [101 L.Ed.2d 669, 108 S.Ct. 2667] ('Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech.') Therefore the relief requested under the Unruh Act is subject to rigorous scrutiny." We agree.

Under the limited but undisputed facts presented, we conclude that appellant's age discrimination claim does not qualify for treatment under the Act. We find no significant distinction between the facts of this case and those of *Hart* where the Court of Appeal concluded the plaintiff had failed to demonstrate a compelling interest to apply the Act in face of the defendant's First Amendment rights. (*Hart, supra*, 13 Cal.App.4th at p. 792.)

### C. *Attorney Fees*

Finally, respondents request an award of attorney fees and costs if we affirm the trial court. They are entitled to such an award. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 659–660 [49 Cal.Rptr.2d 620], overruled in part on other grounds by *Equilon, supra*, 29 Cal.4th at p. 68, fn. 5.)

## DISPOSITION

The order granting the special motion to strike and dismissal of the action is affirmed. Costs and attorney fees, as determined by the trial court upon remand, are awarded to respondents.

Epstein, P. J., and Willhite, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 24, 2005.